SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**WILLIAM M. McLAREN, OSB #143836**
William.McLaren@usdoj.gov
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **6:26-mj-00201** |
| **v.** | **UNITED STATES' MOTION FOR DETENTION** |
| **DYLAN FORD,** | |
| **Defendant.** | |

On the morning of July 28, 2026, Dylan Ford clocked in for his shift as a Lane County Sheriff's Deputy. He also messaged a mid-teen girl, "*Good morning sunshine! How's my baby?*" By that afternoon, state and federal investigators were reviewing his cell phone pursuant to a federal search warrant. They found he had been exchanging sexual messages with that teen and numerous others in the United States and beyond. He used encrypted chats and disappearing photo apps. He instructed them to make bespoke child pornography, including telling one minor to use household objects to perform and record various sexual acts. The minors complied.

Dylan Ford targeted and exploited children in the community despite his sworn duty to protect them. He cannot overcome the presumption in this case. He should be detained.

**United States' Motion for Detention**　　　　　　　　　　　　　　　　　　**Page 1**

## BACKGROUND

The investigation leading to this case began in June 2026, when a self-described mid-teen girl in a country in Southeast Asia ("Minor Victim 1" or "MV1") contacted a woman in Oregon using TikTok.  In summary, MV1 believed she was in an online relationship with the woman's husband.  She believed this because the person she was communicating with, who turned out to be Dylan Ford, sent a picture of the woman's husband.  After confronting her husband, him allowing her to review his device, and her being satisfied it was not him, the woman followed up with MV1.  She was being catfished.  *See* Redacted Complaint ("RC"), ECF No. X, at ¶¶ 8–13.

MV1 followed up with her "boyfriend" about these concerns, and he sent her a picture of himself this time, along with a voice message, both shown below along with a DMV photograph of Ford.  MV1 provided those to the woman, who in turn showed them to her husband.  The picture and the voice belonged to Dylan Ford, who the husband recognized as a fellow deputy at the Lane County Sheriff's Office ("Lane CSO").  RC at ¶¶ 15–16.





*"Hi baby, I miss you and I love you and I hope you are having a good day.*

*I know it is still early. But daddy loves you and daddy misses you and you are my beautiful baby girl."*

**United States' Motion for Detention**                                      **Page 2**

Upon becoming aware of MV1's claim, the Lane CSO contacted the Linn County Sheriff's Office ("Linn CSO") to investigate the situation. Linn CSO in turn contacted FBI, and the two agencies set out to investigate. They sought to determine MV1's identity whether she was in fact communicating with Ford as she claimed to be. Among other information shared with the Oregon woman, MV1 claimed Ford had instructed her to "send nudes." She stated "I send him nudes and make him bracelets with his name on it and a lot of other stuff and we talk every day." RC ¶ 17. MV1 provided the Telegram username communicating with her, and the FBI served a subpoena for subscriber information. The profile had a phone number attached to it. FBI served a subpoena on the cellular provider, and it resolved to Dylan Ford. RC ¶ 20.

On July 28, 2026, investigators applied for and received authorization for a search warrant to search Ford's person, vehicle, premises, a work locker, and review any devices for evidence of child exploitation crimes. RC ¶ 31. The FBI and Linn CSO executed the warrant that day.

Investigators accessed Ford's cell phone pursuant to the warrant. They reviewed several apps, including Telegram and Google Photos. Ford's Telegram chats confirmed he had been in communication with MV1. The investigation is ongoing and the full extent of Ford's actions are yet unknown, what follows are the details of only a fraction of many similar conversations and exchanges. *See* RC ¶ 41.

In Telegram, investigators observed many conversations, including with minors in their mid-teens.[1] Based on the minors' accents, some of their statements, and from other context

---

[1]    Some of the minors told Ford their exact age, but that is anonymized here to protect their information.

**United States' Motion for Detention**                                                            **Page 3**

clues, investigators observed they appeared to mostly be in the United States, but their identities are yet unknown given that only their Telegram accounts were displayed in their chats with Ford.

One of the Telegram conversations Ford was having appeared to be with MV1, who was telling him that there was a law enforcement inquiry.[2] Those messages were exchanged the morning of July 28, 2026.

Ford was also chatting with another apparent minor ("Minor Victim 3" or "MV3") and had been for weeks. She told Ford her age and he acknowledged it. RC ¶ 35. She sent Ford her high school AP world history score and he congratulated her, "Daddy is so proud of you!"

In early July 2026, Ford and MV3 exchanged sexual messages, including one in which he acknowledged her youth, "I want it deep in that teen pussy." Ford requested and MV3 sent numerous images of child pornography. Ford also sent messages encouraging MV3 to engage in depraved sexual acts. He said, "got any carrots?" MV3 responded in the  affirmative. Ford then said, "use it hehe," to which MV3 responded, "wanna see?" Ford then said, "YESSS." After that, MV3 sent a video of a carrot penetrating a vagina. But Ford was not done with MV3. He instructed her to use a hairbrush in a similar manner. MV3 complied. RC ¶¶ 36–38.

Ford was still communicating with MV3 the morning of the search warrant, telling her good morning and asking, "How's my baby?" These exchanges were not isolated to MV1 and MV3, though. Investigators observed at least one other near-identical exchange with a self-described younger teen, ("Minor Victim 4" or "MV4"). MV4 sent Ford a sexual image at his request and asked him whether it was good. Ford responded, "FUCK YESSSS I love it so much send me a vid!" MV4 complied. RC ¶ 40.

---

[2]    Investigators attempted to identify MV1 by contacting someone they believed to be a family member. Investigators believe that person informed MV1. *See* RC ¶ 27–28.

**United States' Motion for Detention**                                                    **Page 4**

Additional child sexual abuse material was found in Ford's Google Photos app. One video was 46 minutes long and depicted another apparent minor ("Minor Victim 2" or "MV2") communicating with an individual who is not depicted in the video. The audio only displays what MV2 is saying. Among other things, MV2 repeatedly displays her vagina. In the video, MV2 appears to be and sounds distressed and verbalizes her reluctance to show herself on camera. At one point, the camera is pointed at the ground, she briefly points it back at herself and shows her vagina. She tells the person she is communicating with, "You already saw it." Toward the end of the lengthy video, MV2 appears to be crying.

Ford was arrested the late afternoon of July 28, 2026, and is slated for his initial appearance the afternoon of July 29, 2026.

## APPLICABLE LAW

### A.    Rules of Evidence Do Not Apply at a Detention Hearing

The Federal Rules of Evidence do not apply in detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F. Supp. 2d 925, 925, 26 (N.D. Cal. 2007).

### B.    Standard and Burden

Under the governing bail statute, 18 U.S.C. § 3142, the government bears the burden of proving by a preponderance of the evidence that a defendant is a flight risk; and community danger requires clear and convincing proof. *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015). Four factors help guide release decisions: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the nature and seriousness of the danger posed to the community; and (4) defendant's history and characteristics. 18 U.S.C. § 3142(g).

**United States' Motion for Detention**                                                      **Page 5**

This case is eligible for a detention hearing and order pursuant to 18 U.S.C. § 3142(f)(1)(E) because the charged crimes involve minor victims. The Bail Statute provides that the charged offense give rise to a rebuttable presumption that no condition or combination of conditions of release will reasonably assure the appearance of the person as required and the safety of the community. 18 U.S.C. § 3142(e)(3)(E). Although the burden of persuasion remains with the government, the presumption shifts the burden of production to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Even if the presumption is rebutted, however, the presumption does not disappear, but continues to carry evidentiary weight. *Id*. ("The presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." (*citing United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir.1986)).

## DISCUSSION

Dylan Ford's interest in and willingness to sexually exploit children presents a profound danger to vulnerable minors, including past and potential victims. The evidence underlying his danger to the community is clear and convincing. His activities on the internet are one and the same as his danger in the community. Any assurances about abstaining from internet use on release or promises about using only monitored devices are insufficient to rebut the presumption and fall well short of ensuring community protection.

Ford's willingness to chat with and entice minors one moment and put on the uniform another shows his ability to conceal his actions beyond the detection of law enforcement, including the agency with which he has been employed for years. Ford's use of disappearing

**United States' Motion for Detention**                                    **Page 6**

photo technology, encrypted chat platforms, and a massive reach to minors domestic and abroad reflect indiscriminate predation.

Future potential victims should be protected from Ford. His minor victims should be protected from potential outreach by him if he is released. Lane County should see justice in this matter without fear of Ford preying on more minors. The factors and arguments supporting detention are addressed below, in turn.

### A. The Nature and Circumstances of the Offense, Danger Posed to the Community, and Weight of Evidence Compel Detention

The charged offenses center around his attempted and completed solicitation of child pornography, enticement of minors to perform sexual acts on camera, and receipt of the images and videos he instructed them to make. These charges are supported by substantial evidence including, but not limited to, a voice recording in the possession of MV1 from Ford, a photograph of his face, and—most powerfully—the contents of his cell phone.

The files saved in his Google Photos app are consistent with his Telegram activity and somehow extend beyond it. The 46-minute video described above is somehow more troubling than the various sexual exchanges. Though it is not certain that Ford is responsible for recording it, the fact that it is in his saved files speaks loudly. A crying minor displaying her genitals is consistent with sextortion, a well-known and oft-used tactic by online predators to get minors to do things they are otherwise reluctant to do. Whether Ford sextorted this minor is currently unknown, but existence of this file in his phone—taken with his instructions to other minors— reflects Ford's danger to the community and weighs in favor of detention.

### B. Ford's History and Characteristics Weigh in Favor of Detention

Ford does not present with a criminal history or a sordid past. The opposite is true. He has long operated in a position of public trust and has placed himself in proximity to minors in

**United States' Motion for Detention**                                                    **Page 7**

that role.  Beyond that, investigators are aware that Ford has involved himself with church

children's groups and volunteered for leadership roles with classes involving young children.

As of the time of arrest, and based on direct inquiries, investigators have no awareness of

hands-on child exploitation in the community or further abuse of these roles.  Nonetheless, the

contents of Ford's phone make absolutely clear his sexual interest in children and cast a long

shadow over his positions of trust in the community.  Below are publicly-available images

displaying Ford in the community posing with various children who are not his own.

  

Without context, these are harmless instances of a law enforcement officer engaging in

community outreach.  But Ford's duplicity, his abuse of public trust, and his proven ability to

hide his actions despite the scrutiny of law enforcement background checks, oaths, and ongoing

duties all speak to a danger that cannot be mitigated with mere monitoring technology or loss of

internet privileges.  Pretrial release offenses occurring in this district over the past several years

drive that point home.  Child pornography offenders on pretrial release can, and do, obtain

contraband devices and re-engage in the very criminal offenses for which they are charged.  *See*

**United States' Motion for Detention**                                          **Page 8**

*United States v. Cook,* Case No. 6:23-cr-00242-MC (D. Or. May 1, 2024) (child pornography distributor sentenced to 168 months' imprisonment, ECF No. 109, after obtaining contraband device and engaging in child pornography distribution while on pretrial release, ECF Nos. 84, 86, 87); *see also United States v. Williams*, Case No. 6:21-cr-00059-MTK (D. Or. Dec. 4, 2024) (child pornography distributor found to possess contraband device while on pretrial release, ECF No. 93, pending sentencing on original charges).

Similarly, child exploitation offenders can and do circumvent electronic monitoring requirements on known devices. *United States v. Sparks*, Case Nos. 6:13-cr-00228-MTK (D. Or. June 7, 2023) (post-prison supervisee circumvented electronic monitoring software to access child pornography, issued an 11-month sanction by the Court, ECF No. 82). In that instance, the same individual procured a contraband phone and reengaged in child pornography distribution even following his sanction. He was sentenced to seventeen years' imprisonment in the second matter. *United States v. Sparks*, 6:24-cr-00261-MTK (D. Or. 2024).

Ford's choice to use encryption platforms and disappearing photo technology suggests a willingness to circumvent detection methods. His efforts taken to hide his actions—from his family, his law enforcement community, and his church—weigh against the likelihood of compliance with potential release conditions. These actions preview the risk of relying on often-anemic single device requirements and monitoring conditions to protect kids from Ford.

The victims in this case are vulnerable and numerous. Ford is, apparently, both resourceful and careful. Relying on Ford's good faith adherence to release conditions would require placing trust in Ford that he has already abused.

**United States' Motion for Detention**                                                                                     **Page 9**

## CONCLUSION

For the reasons stated above, Dylan Ford's risk to the community and abuse of public trust compel his detention pending trial in this matter.

Dated: July 29, 2026

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ William M. McLaren
WILLIAM M. McLAREN
Assistant United States Attorney